Carlos Sebastian SMITH, Petitioner,

v.

C.K. PLILER, Warden, Respondent.

No. C 02–1092 CRB (PR).

United States District Court,
N.D. California.

Aug. 15, 2003.

Aileen Bunney, Office of Attorney General, San Francisco, CA.

Carlos Sebastian Smith, California State Prison—Solano, Vacaville, CA.

### ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS

BREYER, District Judge.

Petitioner was convicted by a jury in the Superior Court of the State of California in and for the County of Alameda of first degree murder and second degree burgla-

ry. The jury also found that he personally used a dangerous weapon in committing the murder. In a bifurcated proceeding, the court found that petitioner had previously been convicted of a serious felony and, on July 11, 1999, sentenced him to 56 years to life in state prison.

On December 21, 2000, the California Court of Appeal reversed the burglary conviction, but affirmed the judgment in all other respects. On February 28, 2001, the Supreme Court of California denied review and, on October 31, 2001, denied petitioner's request for state habeas relief.

Petitioner then filed the instant federal petition for a writ of habeas corpus under 28 U.S.C. § 2254. Per order filed on July 2, 2002, the court found that the petition, when liberally construed, stated cognizable claims under § 2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent has filed an answer to the order to show cause and petitioner has filed a traverse.

## FACTUAL BACKGROUND

The California Court of Appeal summarized the facts of the case as follows:

The parties stipulated that on January 19, 1998, appellant stabbed Tiffany Boyce once and killed her. The issue for the jury was the degree of his culpability.

*Appellant/Boyce Relationship*

Appellant and Boyce began dating in 1996. After they broke up in the spring of 1997, Boyce told her close friend, Brande Brown, that appellant was "smothering" her. Appellant contacted Brown for advice about Boyce, repeatedly saying, "I can't let her go." When Brown asked him to "back off" and let Boyce "have her space," he replied he did not understand how a woman as beautiful as Boyce would "want someone like him," and for that reason he could not let her go.

Boyce and appellant continued to date occasionally in the summer of 1997. One evening in August, Brown and Boyce were talking from their respective apartments on the telephone when Boyce cried out that appellant was at her window. On Brown's advice, Boyce told appellant that Brown was calling the police and coming with her boyfriend to pick up Boyce. Brown and her boyfriend then drove to Boyce's apartment, where Boyce, who was very scared, was waiting for them. They took her to Brown's apartment, and she stayed there for approximately a week.

In the summer of 1997, Boyce's supervisor allowed her to transfer from the satellite facility where she was working to the main facility because she was receiving harassing telephone calls and visits from her boyfriend at the satellite facility. Calls at the main facility are screened by the administrative assistant.

On one occasion, in late summer 1997, Connie Marcial, who had the apartment directly above Boyce, saw and heard Boyce and appellant quarreling in the apartment parking lot. She heard Boyce yelling, "I'm tired of this. I'm tired of this," after which Boyce and appellant went into Boyce's apartment. Marcial then heard objects being thrown against the wall and dishes breaking. One evening during the same time frame, Marcial heard Boyce screaming, "Get away from my window or I'm going to call the police." She then heard appellant say, "Tiff, Tiff, I just came by to see how you are doing." On another nighttime occasion, Marcial heard footsteps in the apartment parking lot, but had not heard a car. She saw appellant walking away from Boyce's window. He caught Marcial's eye, then walked out of the parking lot to his parked car on the

street. He previously always parked in the apartment parking lot, which had empty spaces that night. He drove away without turning on his headlights.

On one occasion in autumn 1997, appellant drove Brande Brown and Boyce to an ice cream parlor. Boyce became upset at appellant and told Brown, "Let's go; we are walking." Appellant followed them in his car. He yelled at Boyce to get in the car, and she yelled at him to go away. He drove onto the sidewalk, nearly hitting the two women. He got out of the car, grabbed Boyce, and tried to force her into the car. Boyce, with Brown's assistance, tried to pull away from him. The struggle ended when "a lot of lights" came on, and Boyce and Brown walked home.

Appellant and Boyce continued to have a rocky relationship for the rest of the year.

On December 26, 1997, Boyce took a 10–day vacation to New York to visit her sister Tanya. Before leaving she told Brown that she wanted to be friends with appellant but planned to "get rid" of him as a boyfriend. Boyce returned from New York very enthusiastic about a man named Jason Bobb, whom she met through her sister. She and Bobb agreed on an exclusive relationship, and she planned to transfer to a New York school the following semester. She continued to see appellant in January 1998 as a friend, and he did favors for her, such as driving her to buy her school books.

On January 15, 1998, appellant told a friend and neighbor, Veronica Davis, that he was angry with Boyce because he thought she wanted to see other men. He specifically mentioned a man from New York. When Davis asked appellant why he should be upset with Boyce, given that he was seeing other woman, he replied he was going to "do what [I] want to do."

*January 19, 1998*

On January 19, the Martin Luther King, Jr., holiday, Jason Bobb telephoned Boyce from the East Coast sometime between 2:00 p.m. and 4:00 p.m., California time. They spoke less than a minute. Usually talkative, Boyce sounded sad and nervous and said she would return his call later, but never did.

At approximately 2:15 p.m., Boyce's upstairs neighbor saw appellant's car in the building parking lot. The neighbor did not hear any commotion or argument from Boyce's apartment in the ensuing hours.

At approximately 3:45 p.m., appellant, in response to a page from Veronica Davis, telephoned Davis, who said it was time to collect his daughter, who had been staying at her house for several days.

Between 4:00 and 5:00 p.m., Brown spoke with Boyce, who sounded fine and said she would see Brown at work the next day.

*Subsequent Events*

On January 20 at approximately 5:30 a.m., a ground floor resident of appellant's apartment heard a clanking sound coming from the area outside her bedroom at the back of the building. At 6:45 a.m., she investigated the area to determine the origin of the noise. She saw a shovel "sitting up" alongside a small hole behind an outbuilding. She departed for the day, and when she returned at 5:30 p.m., she looked again and saw the hole covered with vines and old tires. The shovel was gone.

On January 21, after Boyce, a reliable employee, had failed to appear at work for two days, her supervisor filed a missing persons report with the local police department. Later that same day, Gina Withers, a friend and coworker, went to

appellant's apartment to inquire about Boyce. He replied he had no idea where she was, and did not seem concerned that she was missing. Withers then went to Boyce's apartment. The landlord let her into Boyce's apartment, which appeared ransacked.

During the week of January 21, Withers and Brande Brown spoke to appellant daily about Boyce's disappearance. He denied any knowledge of her whereabouts.

On January 25, when Veronica Davis learned that Boyce was missing, she asked appellant if he had done something to her. He replied that "one time" he choked her, but he had never beaten her or "nothing like that." He denied having anything to do with her disappearance.

On February 9, in a statement to a police investigator, appellant denied any knowledge of Boyce's disappearance. He told the investigator he and Boyce were "just close friends" and that he had last seen her Sunday night, January 18.

On February 14, the police, pursuant to a search warrant, investigated Boyce's studio apartment. They found a large blood stain that had soaked through the carpet to the padding in the southwest corner of the living room. The bathroom contained blood in multiple locations. The kitchen contained blood above the faucet and on the floor.

*Pathology*

On February 18, 1998, Boyce's dismembered body was found buried in the backyard behind appellant's apartment building. Cause of death was a single stab to the lower part of the heart, which would have caused death within three to five minutes. The wound was consistent with a nonserrated kitchen knife. There were no defensive wounds on the body. The dismemberment was post-mortem.

*Defense*

Appellant testified in his own defense. During their relationship, he and Boyce argued because her friends disapproved of him. They broke up several times but were "together" at Christmas 1997. He took her to the airport for her trip to New York, she telephoned him three times during her visit, and he picked her up when she returned on January 6. She told him she was glad to have reconciled with her sister. He and Boyce saw each other almost every day thereafter and did not quarrel. He was unaware that Boyce had another romantic relationship.

On January 19, he arrived at her house at approximately 2:00 p.m. with dinner. They spend the afternoon together, smoked marijuana and drank. Boyce received several telephone calls during the afternoon, including one from Brande Brown. When Brown called, appellant's head was in Boyce's lap. After Brown's call, he got a page call from his daughter and told her he would pick her up soon.

When he told Boyce he was leaving to collect his daughter, she became angry and said they needed to talk. She complained that she needed a man who would care for her financially and not depart every time his pager beeped. She criticized him as a father and belittled his children, saying his daughter smoked marijuana and his son got poor grades. He went into the kitchen, got a glass of water, stood in the kitchen doorway, and said he had to leave. She pushed him and said, "That's why I am fucking someone else."

In reaction to her last remark he grabbed a knife from a cutting board in the kitchen and poked her with it. He dropped the knife, and she stumbled backwards. He grabbed her, laid her

down, and said he "didn't mean to do that." He breathed into her mouth, but when she stopped gasping, his mind "blew up" and he did not know what to do. He laid her in the bathtub and splashed water on her. When she did not respond, he paced for a while and left to pick up his daughter and leave her with Veronica Davis. He returned to Boyce's apartment, cleaned up some blood, and took her body to his apartment. He again returned to Boyce's apartment, cleaned some more, and tossed objects about with the intent to "make it look like something else happened," not to steal. He left with Boyce's television and stereo, which he dropped off at Goodwill, and her VCR, which he forgot to drop off and subsequently hooked up to his television.

He could not explain why he dismembered Boyce's body; his action was beyond his control. He thought he should hide the body, so he buried it in his backyard.

He acknowledged a previous felony assault conviction.

*Rebuttal*

Tanya Boyce testified that when Boyce was visiting her in New York, she said she had terminated her relationship with appellant several times and was currently in the process of ending it. On Sunday, January 18, Boyce spoke by telephone to Tanya. She told Tanya she ended her relationship with appellant shortly after returning from New York. She also said she told appellant about Jason Bobb, and on January 16 had reiterated the break-up to appellant by returning his belonging and asking for hers.

*People v. Smith,* No. A088298, slip op. at 1–6 (Cal.Ct.App. Dec. 21, 2000) (Resp't Ex. I).

## DISCUSSION

### A. *Standard of Review*

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application

must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495.

▮▮▮ The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the ·Supreme Court as of the time of the state court decision. *Id.* at 412, 120 S.Ct. 1495; *Clark v. Murphy,* 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Id.*

## B. *Claims*

Petitioner raises six claims for relief under § 2254:(1) the trial court erred in admitting a prejudicial videotape; (2) the trial court erred in determining that petitioner did not make a showing of discriminatory use of peremptory challenges; (3) the first degree murder conviction is not supported by substantial evidence; (4) the trial court erred in admitting prejudicial evidence of prior acts of violence; (5) erroneous jury instructions; and (6)· denial of fair trial due to the cumulative effect of the errors.

### 1. *Admission of videotape*

Petitioner claims that the trial court's admission of a videotape of the recovery of the victim's body deprived him of his due process right to a fair trial. Petitioner argues that the tape was cumulative and inflammatory.

At trial, the prosecutor offered a videotape of the recovery of the body of Tiffany Boyce as probative evidence on the issue of intent and premeditation and, over defense counsel's unspecified objection, the court allowed the tape to be played to the jury. The videotape showed the excavation and recovery of a canvas duffel bag and three plastic bags, and had no sound. After the tape was played and the jury was excused, defense counsel articulated his objection that the tape was more prejudicial than probative under California Evidence Code section 352. The court disagreed:

> The court conducted a 352 analysis just based on the offer of proof both from , [the prosecutor] and [defense counsel], and it appears that it has more probative value. There is nothing gory about it other than the fact we are dealing with the recovery of a body. And I think it has probative value on the issue of intent and premeditation.

Rep. Tr. at 701–02.

Petitioner did not appeal the trial court's evidentiary ruling; however, he exhausted his current claim that the admission of the tape denied him due process by raising it in a petition for a writ of habeas corpus in the Supreme Court of California, which the court summarily denied. *See In re Smith,* No. S098969, slip op. at 1 (Cal. Oct. 31, 2001) (citing *In re Dixon,* 41 Cal.2d 756, 264 P.2d 513 (1953)).

▮▮▮ A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Jammal v. Van de Kamp,* 926 F.2d 918, 919–20 (9th Cir.1991). Accordingly, a federal court cannot disturb on due process grounds a state court's decision to admit evidence

unless the admission of the evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See Walters v. Maass,* 45 F.3d 1355, 1357 (9th Cir.1995); *Colley v. Sumner,* 784 F.2d 984, 990 (9th Cir.1986).

"Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions." *Jammal,* 926 F.2d at 920 (footnote omitted). Only if there are no permissible inferences the jury may draw from the challenged evidence can its admission violate due process. *Id.* Even then, the evidence must "be of such quality as necessarily prevents a fair trial." *Id.* (citation and internal quotation marks omitted).

█ In order to obtain habeas relief on the basis of evidentiary error, petitioner must show that the error was one of constitutional dimension *and* that it was not harmless under *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). The court must find that the error had " 'a substantial and injurious effect' on the verdict." *Dillard v. Roe,* 244 F.3d 758, 767 n. 7 (9th Cir.2001) (quoting *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710).

█ This court cannot disturb the state trial court's admission of the videotape on due process grounds because it cannot be said that there were no permissible inferences the jury could have drawn from the tape. *See Jammal,* 926 F.2d at 920. Although the videotape did not amount to overwhelming evidence of premeditation and deliberation, there were clear permissible inferences of premeditation and deliberation the jury could have drawn from it. Along with latter testimony as to the con-

dition of the body parts found inside the excavated bags, the videotape showed a careful disposal of the body in a manner designed to make identification difficult. A jury could reasonably infer from this evidence "presence of mind and cool resolve, contrary to sudden, impassioned behavior." *People v. Smith,* No. A088298, slip op. at 12 (Cal.Ct.App. Dec. 21, 2000).

Nor cannot it be said that the videotape was the type of evidence that necessarily prevents a fair trial. *See Jammal,* 926 F.2d at 920–21. The state trial court's finding that there was nothing gory about the videotape is entitled to a presumption of correctness petitioner does not rebut. *See* 28 U.S.C. § 2254(e)(1) (district court must presume correct any determination of fact made by a state court unless petitioner rebuts the presumption of correctness by clear and convincing evidence). And there is no showing (or even indication) that the videotape inflamed the jury. After all, the videotape did not provide the jury with significantly more information about petitioner or the circumstances of the crime that it learned from other evidence and testimony. Petitioner is not entitled to federal habeas relief on his claim that the admission of the videotape deprived him of his due process right to a fair trial. *Accord Kealohapauole v. Shimoda,* 800 F.2d 1463, 1464–66 (9th Cir. 1986) (videotape of victim's autopsy probative on issue of victim's cause of death and, although unpleasant, not inflammatory, and therefore did not inject element of unfairness).[1]

## 2. *Exercise of peremptory challenges*

Petitioner, who is African American, claims that the trial court erred in finding

---

1. Petitioner is also precluded from federal habeas relief because, after a careful review of the record and other evidence against him, it cannot be said that the admission of the videotape, even if constitutional error, had a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht,* 507 U.S. at 637, 113 S.Ct. 1710.

that he failed to make a showing of discriminatory use of peremptory challenges against two African–American female prospective jurors. He argues that the discriminatory use of peremptory challenges against these two prospective jurors deprived him of his right to equal protection under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

The record shows that voir dire in this case consisted of a lengthy questionnaire about the jurors' backgrounds and subsequent oral questioning. Two African–American women, jurors 62 and 63, were called to the jury box, and both were excused by the prosecutor's peremptory challenge. After juror 63 was excused, defense counsel made a *"Batson/Wheeler* motion"[2] on the ground that the two jurors were improperly excused based on their race, asserting that typically the two jurors would be considered "pro prosecution," given certain factors in their background and being the same race as the victim.

By agreement of the trial court and the parties, petitioner's motion was considered after completion of jury selection. The court stated that it did not believe petitioner had made a prima facie showing, but allowed the prosecutor to give his reasons for excusing the two jurors. After the prosecutor did so, the court denied petitioner's motion. The court reiterated that petitioner did not make a prima facie showing of purposeful racial discrimination, and added that the prosecutor's reasons for excusing the two jurors were race-neutral and that its own observation

supported a race-neutral use of peremptory challenges. The California Court of Appeal affirmed, concluding that the trial court properly found that petitioner "did not establish a prima facie case of discrimination." *People v. Smith,* No. A088298, slip op. at 10 (Cal.Ct.App. Dec. 21, 2000).

■ The Equal Protection Clause forbids the exclusion of jurors by peremptory challenge solely on account of their race. *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Batson* permits prompt rulings on objections to peremptory challenges under a three-step process. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. *Id.* at 96–97, 106 S.Ct. 1712. That is, the defendant must demonstrate that the facts and the circumstances of the case "raise an inference" that the prosecution has excluded venire members from the petit jury on account of their race. *Id.* at 96, 106 S.Ct. 1712. If the defendant makes this showing, the burden then shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id.* at 97, 106 S.Ct. 1712.[3] Finally, the court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* at 98, 106 S.Ct. 1712.

■ Ordinarily, a state court's fact-specific determination of whether a defendant has established a prima facie case of discrimination under *Batson* is entitled to a "statutory presumption of correctness" on federal habeas review. *Tolbert v. Page,*

---

2. In California, a party who believes his opponent is using his peremptory challenges to strike jurors on grounds of group bias alone may raise the point by way of a timely motion. *See People v. Wheeler,* 22 Cal.3d 258, 280, 148 Cal.Rptr. 890, 583 P.2d 748 (1978). After *Batson,* these motions have been commonly referred to in the California courts as *"Batson/Wheeler* motions."

3. During step two, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

182 F.3d 677, 685 (9th Cir.1999) (en banc). However, where the state courts have applied the wrong legal standard, 28 U.S.C. § 2254's rules of deference do not apply and the reviewing federal habeas court must review de novo whether the defendant made a prima facie case of a *Batson* violation. *See Fernandez v. Roe,* 286 F.3d 1073, 1077 (9th Cir.2002); *Cooperwood v. Cambra,* 245 F.3d 1042, 1046 (9th Cir. 2001); *Wade v. Terhune,* 202 F.3d 1190, 1197 (9th Cir.2000).

▆ In *Wade,* the Ninth Circuit held that California state courts following *Wheeler* have erroneously required a defendant to show a "strong likelihood" of discrimination to establish a prima facie case rather than just an "inference" of discrimination as required by *Batson. Wade,* 202 F.3d at 1197. Accordingly, no statutory presumption of correctness need be afforded where this erroneous standard was applied. *See, e.g., Fernandez,* 286 F.3d at 1077 (no presumption of correctness for decision that applied incorrect "strong likelihood" standard); *Wade,* 202 F.3d at 1195 (same). Here, however, the California Court of Appeal recognized that the Supreme Court of California has now clarified that "[f]or *Wheeler* purposes 'strong likelihood' is synonymous with 'reasonable inference.'" *People v. Smith,* slip op. at 8 (citing *People v. Box,* 23 Cal.4th 1153, 1188, 99 Cal.Rptr.2d 69, 5 P.3d 130 (2000)). Or, as the state high court put it, "in California, a 'strong likelihood' means a 'reasonable inference.'" *Box,* 23 Cal.4th at 1188 n. 7, 99 Cal.Rptr.2d 69, 5 P.3d 130. Under these circumstances, and after a careful review of the state appellate court's decision, the court is satisfied that the California Court of Appeal did not apply an incorrect legal standard. *Cf. Cooperwood,* 245 F.3d at 1047 (applying de novo review standard where state court applied "strong likelihood" standard five years before *Box* decision was issued). The California Court of Appeal's decision

will accordingly be afforded proper deference under § 2254. *See Tolbert,* 182 F.3d at 685.

The California Court of Appeal found that in addition to stating that the prosecutor excluded the two African–American female prospective jurors, petitioner only "cited certain voir dire answers that, in his view, made them appear sympathetic to the prosecution." *People v. Smith,* slip op. at 9. The court held that "[t]hese bases alone do not suffice to establish a prima facie case of discrimination." *Id.* (citation omitted). In addition, the court held that "inasmuch as the record suggests grounds upon which the prosecutor could reasonably have challenged jurors 62 and 63," the trial court's ruling must be affirmed. *Id.* The court explained:

First, we do not dispute that, subjectively, there could be a superficial appeal for the prosecutor to retain jurors of the same race as the victim. Consequently, the very fact the prosecutor excused jurors 62 and 63 suggests he based his challenge on grounds other than race.

Second, although the background of both jurors contained arguable "pro prosecution" factors, such as personal acquaintance with members of law enforcement, prior criminal jury experience resulting in a verdict, and use of the court process for protection in the form of a restraining order, they also contained factors with which a prosecutor might not be comfortable. Juror 62, for example, had been arrested for petty theft. Until the charges were dismissed when the witnesses were unavailable, she was prepared to go to trial because she believed herself to be innocent. Peremptory challenges may be made on an apparently trivial or highly speculative basis as long as the basis relates to specific, not group, bias. A prosecutor could construe juror 62's remarks as suggesting a readiness to align herself

with a defendant like appellant who professed himself innocent of the requisite elements of the crime charged. Similarly, her questionnaire response that scientific evidence was helpful in a criminal trial because it reduced the possibility of wrongful convictions, as opposed to responding that it helped establish guilt, could suggest to a prosecutor a juror more sympathetic to defendants than to the People.

Juror 63's voir dire responses could suggest to an experienced prosecutor a juror whom he would have difficulty convincing of first degree murder because she regretted a prior decision as a juror. Juror 63 had previously served as a juror in a factually similar domestic violence murder case in which the jury found "malice aforethought." She had argued for a "lower degree" because she did not think the defendant "put a lot of forethought" into killing, but ultimately "went over" to the side of the other jurors who argued that a hung jury would be costly to the taxpayers. She learned from that jury experience to "stick to" her own beliefs and not allow fellow jurors to pressure her to accept their beliefs. In a case where the degree of culpability was the principal issue, the prosecutor could be concerned that juror 63, to compensate for her previous decision, might be unwilling to consider appellant guilty of any kind of unlawful killing more serious than manslaughter, even if presented with strong evidence of the elements of murder.

Because the responses of jurors 62 and 63 indicate a proper basis for their excusal, the court could properly find that appellant did not establish a prima facie case of discrimination, and so did not err in denying the motion.

*People v. Smith,* slip op, at 9–10 (citations omitted).

■■■ The California Court of Appeal's rejection of petitioner's *Batson* claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or involved an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Petitioner made no showing of group bias other than the fact that the prosecutor peremptory challenged two African–American female prospective jurors. This was not enough. It is well-established that "the challenge of two minority jurors does not, in and of itself, create a prima facie case of purposeful discrimination." *United States v. Chinchilla,* 874 F.2d 695, 698 (9th Cir. 1989); *see also Fernandez,* 286 F.3d at 1078–79 ("Because the numbers are so small (and, hence, potentially unreliable), two such challenges, standing alone, may not be sufficient to support an inference of discrimination.") (citations omitted). Petitioner's contention that the two prospective jurors were "pro prosecution" does not compel a different conclusion. The record makes clear that there were race neutral bases for the prosecutor's decision to remove these two jurors. After all, there were other black jurors on the jury panel. Considering all relevant circumstances surrounding the two challenges at issue, the state courts' decision that petitioner did not establish a prima facie case of a discriminatory use of a peremptory challenge is entitled to a presumption of correctness petitioner does not rebut. *See Tolbert v. Gomez,* 190 F.3d 985, 989 (9th Cir.1999). At minimum, the state courts' rejection of petitioner's *Batson* claim was reasonable, which means that it must stand. *See Early v. Packer,* 537 U.S. 3, 123 S.Ct. 362, 366, 154 L.Ed.2d 263 (2002).[4]

---

4. De novo review of petitioner's claim does not compel a different result. *Cf. Fernandez,* 286 F.3d at 1078–79 (although two challenges against only two prospective African–American jurors insufficient to support inference of discrimination, where prosecutor's behavior

Petitioner is not entitled to federal habeas relief on his *Batson* claim.

### 3. *Sufficiency of evidence*

Petitioner claims that there was insufficient evidence to support his conviction of first degree murder. He specifically argues that the prosecution failed to establish that he committed premeditated and deliberate murder.

The relevant inquiry on review of a constitutional challenge to the sufficiency of the evidence to support a criminal conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). The reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear on the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326, 99 S.Ct. 2781.

Under California Law, murder is the unlawful killing of a human being with malice aforethought. Cal.Penal Code § 187(a). "All murder which is perpetrated by means of a . . . willful, deliberate, and premeditated killing . . . is murder of the first degree." *Id.* § 189.

Here, the California Court of Appeal applied the standard of review set forth in *Jackson* and rejected petitioner's claim that there was insufficient evidence of premeditation and deliberation to support the first degree murder verdict. *People v. Smith*, slip op. at 10–12. The court explained:

had already supported an inference of discrimination and trial court had already warned him against striking any more His-

In general there are three types of evidence that may sustain a finding of premeditation and deliberation: (1) defendant's planning activity prior to the killing; (2) defendant's motive to kill, inferred from his prior relationship with the victim; and (3) the manner of the killing, which may imply the defendant had a preconceived design to kill. ( [*People v. Wharton* (1991) 53 Cal.3d 522, 546, 280 Cal.Rptr. 631, 809 P.2d 290.] ) An appellate court typically sustains a verdict of first degree murder when there is strong evidence of all three types of evidence or otherwise requires a least extremely strong evidence of planning or evidence of motive in conjunction with either planning or manner of killing. (*Id.* at 546–547, 280 Cal.Rptr. 631, 809 P.2d 290.) These guidelines are a synthesis of case law, not a definitive statement of the prerequisites for proving premeditation and deliberation in every case. (*People v. Welch,* 20 Cal.4th 701, 758, 85 Cal.Rptr.2d 203, 976 P.2d 754 (1999).)

There was strong evidence of appellant's motive to kill Boyce, based on inferences from their relationship. They had a turbulent relationship for more than a year, with several break-ups, initiated by Boyce, and reconciliations. After one break-up he told Brande Boyce repeatedly that he could not let Boyce go. He essentially spied on Boyce by peering in her window or following her in his car. When Boyce finally terminated their intimate relationship, appellant felt used because she continued having him do errands for her even though she was involved with another man. From this evidence the jury could reasonably view the situation as a

panics, subsequent strikes against only two prospective African–American jurors supported an inference of discrimination).

case of such extreme jealousy that the rejected party, if he cannot be with the rejecting party, determines that she will be unavailable for anyone else's company.

Although not overwhelming, there was some evidence from which the jury could infer planning. Premeditation need not be lengthy; it can occur in a very short period of time. (*People v. Bloyd,* 43 Cal.3d 333, 348, 233 Cal.Rptr. 368, 729 P.2d 802 (1987).) Given his lies to Boyce's friends that he did not know her whereabouts and the inconsistencies between his statements to the police and trial testimony, the jury could reasonably reject appellant's testimony that he stabbed Boyce with a kitchen knife solely as a spontaneous reaction to her telling him she was sexually intimate with another man. Instead, it could infer that, given his long-held possessiveness, he went to the kitchen when they quarreled, not to get a drink of water, but to retrieve a knife and return with it to the living room to kill her. (See *Wharton, supra,* 53 Cal.3d at 547, 280 Cal.Rptr. 631, 809 P.2d 290.)

The manner of the killing also permits an inference that appellant had a preconceived design to kill. Boyce was stabbed once at an extremely vulnerable site of the heart, there were no signs of a struggle, and the angle of the wound—upward from the left to right side of the body—can suggest an ambush-type stabbing by a left-handed person, as is appellant, coming from behind the victim.

Finally, although not sufficient by itself to establish premeditation and deliberation, a defendant's post-crime conduct may be material if it is inconsistent with a rash, impulsive killing. (See *People v. Perez,* 2 Cal.4th 1117, 1128, 9 Cal.Rptr.2d 577, 831 P.2d 1159 (1992).) Here, appellant's return to the scene of the crime soon after the killing and his

careful disposal of the body in a manner designed to make identification difficult reasonably imply presence of mind and cool resolve, contrary to sudden, impassioned behavior.

We conclude that the combined motive, planning and manner of killing evidence was sufficient for the jury to find the killing was deliberate and premeditated.

*People v. Smith,* slip op. at 11–12.

█ The California Court of Appeal's decision was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or involved an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). The state court reasonably concluded that the record evidence, when viewed in the light most favorable to the prosecution, was such that a rational trier of fact could reasonably have found that petitioner's killing of Boyce was deliberate and premeditated under California Law. *See Jackson,* 443 U.S. at 319, 99 S.Ct. 2781; *Payne v. Borg,* 982 F.2d 335, 338–39 (9th Cir. 1992). It matters not that the evidence supporting a finding of deliberation and premeditation was not "direct" and/or "substantial." Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. *See Walters v. Maass,* 45 F.3d 1355, 1358 (9th Cir.1995). Petitioner is not entitled to federal habeas relief because the California Court of Appeal's determination that there was sufficient evidence for the jury to find that the killing was deliberate and premeditated was reasonable, "which means that the state court's determination to that effect must stand." *Early,* 123 S.Ct. at 366.

4. *Admission of prior acts of violence*

Petitioner claims that the trial court's admission of evidence of several prior uncharged incidents of violence and stalking

denied him the fair trial guaranteed by the Due Process Clause. He also claims that California Evidence Code section 1109, which allows evidence of prior acts of domestic violence to be admitted when a defendant is accused of a crime involving domestic violence, violates due process.

The record shows that the prosecutor sought to introduce into evidence several prior incidents of violence and stalking by petitioner against Tiffany Boyce. Pursuant to California Evidence Code section 1101(b), the trial court admitted as evidence of intent and motive the following: (1) the testimony of Brande Brown regarding the altercation at the ice cream parlor and petitioner's appearing at Boyce's window while she and Brown were talking on the telephone; (2) the testimony of Connie Marcial regarding the time she heard Boyce scream, "Get away from the window;" the argument she heard/saw between Boyce and petitioner in the apartment parking lot, followed by banging in Boyce's apartment; and the time she saw petitioner walk away form Boyce's window and drive away without his headlights on after catching Marcial's eye; and (3) the testimony of Veronica Davis that petitioner told her he once choked Boyce. The court also admitted the ice cream parlor and telephone call incidents as evidence of prior acts of domestic violence pursuant to California Evidence Code sections 352 and 1109. The court excluded prior incidents of domestic violence against petitioner's ex-wife (as well as incidents where there were no independent witnesses to the violence) because their probative value did not outweigh their prejudicial value under a section 352 balancing test.

The California Court of Appeal rejected petitioner's claim, finding that neither section 1109 nor the admission of the prior acts of violence and stalking noted above violated "constitutional principles of due process." *People v. Smith,* slip op. at 12–15. As to the evidence admitted under section 1109, the court specifically stated:

Evidence of the ice cream parlor incident and the Brown/Boyce telephone conversation was relevant to the volatile nature of appellant's relationship with Boyce and probative of issues critical to the case: appellant's intent and motive. Nothing in the record suggests Brown was an untrustworthy witness. The incidents were not remote in time, and they involved Boyce herself, not a third party. There is little danger their admission would have confused or misled the jury from its principal inquiry as to the degree of appellant's culpability. The fact that appellant admitted killing Boyce reduces the likelihood that the jury was tempted to punish him in this case for past acts. We also observe that the court refused to admit other purported acts of violence, as irrelevant, unreliable or too remote. The record demonstrates that the court understood and fulfilled its responsibilities under Evidence Code section 352, and that it could reasonably conclude the admitted prior acts were of significant probative value without being unduly prejudicial.

*Id.* at 13–14 (citation omitted). And as to the evidence admitted under section 1101(b), the court added: "We reiterate that the critical issues for the jury's resolution related to appellant's intent in killing Boyce. Specifically, was the killing deliberate and premeditated, or did it occur in a sudden quarrel or heat of passion? Evidence of domestic discord and prior assaults can support an inference that the defendant intended to commit a premeditated murder." *Id.* at 14 (citation omitted). "We find no abuse of discretion in admitting evidence of appellant's prior acts of attempting physical injury to Boyce or their incendiary disputes." *Id.* at 14–15.

The California Court of Appeal's decision was not contrary to, or involved

an unreasonable application of, clearly established Supreme Court precedent, or involved an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). The court reasonably concluded that section 1109 does not facially violate due process because the trial court retains discretion under section 1109 to exclude prior acts of domestic violence it finds more prejudicial than probative. *Cf. United States v. LeMay,* 260 F.3d 1018, 1031 (9th Cir.2001) (new federal rules of evidence allowing evidence of prior sexual offenses to show a propensity to commit the charged offense do not violate due process because evidence is still subject to trial court balancing test which provides for meaningful appellate review). And it reasonably concluded that the trial court properly admitted evidence of petitioner's prior acts of violence and stalking against Boyce.

The Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith, or that it violates due process to admit other crimes evidence for other purposes without an instruction limiting the jury's consideration of the evidence to such purposes." *Garceau v. Woodford,* 275 F.3d 769, 774 (9th Cir.2001), *overruled on other grounds by* 538 U.S. 188, 123 S.Ct. 1389, 155 L.Ed.2d 349 (2003). In fact, the Court has expressly declined to answer these questions. *See Estelle v. McGuire,* 502 U.S. 62, 75 n. 5, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("Because we need not reach the issue, we express no opinion on whether a state law would violate Due Process if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."). Petitioner is therefore precluded from federal habeas relief on his claim that the admission of prior incidents

of violence and stalking violated his federal due process rights. *See, e.g., Holgerson v. Knowles,* 309 F.3d 1200, 1203 (9th Cir. 2002) (although Supreme Court has clearly established that retroactive increases in the scope of criminal liability by judicial construction are barred by the Due Process Clause, it has not clearly established that retroactive sentence enhancements by judicial construction also violate due process and therefore federal habeas relief on such a claim may not be had under § 2254); *see also Alvarado v. Hill,* 252 F.3d 1066, 1068-69 (9th Cir.2001) (The question under § 2254(d) "is not whether [the conviction] violates due process as that concept might be extrapolated from the decisions of the Supreme Court. Rather, it is whether [the conviction] violates due process under 'clearly established' federal law, as already determined by the Court.").

Even if the Ninth Circuit's more generous precedent applied here, petitioner's claim would fail. Under Ninth Circuit law, the admission of other crimes evidence violates due process only if there were no permissible inferences the jury could have drawn from the evidence (in other words, no inference other than conduct in conformity therewith). *See McKinney v. Rees,* 993 F.2d 1378, 1384 (9th Cir.1993); *Jammal v. Van de Kamp,* 926 F.2d 918, 920 (9th Cir.1991). And even so, the evidence must be of such highly inflammatory or emotionally charged quality as necessarily prevents a fair trial. *See McKinney,* 993 F.2d at 1384-85; *Jammal,* 926 F.2d at 920-21. That was not the case here. The evidence of petitioner's prior acts of violence and stalking against Boyce were probative of petitioner's intent and motive, and not so highly inflammatory or emotionally charged as to necessarily prevent a fair trial. *See id.*[5]

---

5. *Garceau v. Woodford,* a pre-AEDPA case in which the Ninth Circuit found that an instruc-

tion permitting the jury to consider priors for purposes of establishing propensity violated

At minimum, it was reasonable for the California Court of Appeal to conclude that the admission of the evidence of petitioner's prior acts of violence and stalking against Boyce did not render petitioner's trial fundamentally unfair in violation of due process, "which means that the state court's determination to that effect must stand." *Early v. Packer*, 537 U.S. 3, 123 S.Ct. 362, 366, 154 L.Ed.2d 263 (2002).[6] Petitioner is not entitled to federal habeas relief on this claim.

### 5. *Jury instructions*

Petitioner claims that instructing the jury pursuant to CALJIC No. 2.50.02 and CALJIC No. 2.50.1 violated his right to due process by lessening the prosecution's burden of proof. He specifically claims that the instructions' permissive inferences allowed the jury to infer guilt solely on the basis of prior acts of domestic violence proved by a preponderance of the evidence.

The record shows that the trial court instructed the jury on prior acts of domestic violence using the pre–1999 version of CALJIC No. 2.50.02. It stated, in relevant part: "If you find that the defendant committed a prior offense involving domestic violence, you may, but are not required to, infer that the defendant has a disposition to commit the same or similar type offenses. [¶] If you find that defendant had this disposition, you may, but are not required to, infer that he was likely to

commit and did commit the crime for which he is accused."[7] The court further instructed with CALJIC 2.50.1 that "[w]ithin the meaning of the preceding instruction, the prosecution has the burden of proving by a preponderance of the evidence that the defendant committed acts and crimes other than that for which he is on trial. You must not consider that evidence for any purpose unless you find by a preponderance of the evidence that the defendant committed the other acts and crimes."

To obtain federal habeas relief for error in the jury charge, petitioner must show that the error "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The error may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Id.* Here, where ambiguous or potentially defective instructions are at issue, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instructions in a way that violates the Constitution. *See id.* at 72 n. 4; *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

A determination that there is a reasonable likelihood that the jury has applied the challenged instructions in a way that violates the Constitution establishes

---

due process, is distinguishable because in *Garceau* the prosecution's case was not strong and the evidence of the prior was emotionally charged. *See Garceau*, 275 F.3d at 775–76.

**6.** Petitioner is also precluded from federal habeas relief because, after a careful review of the record and evidence, it cannot be said that the admission of the evidence of his prior acts of violence and stalking, even if constitutional error, had a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S.

619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

**7.** CALJIC No. 2.50.02 was revised in 1999 to include the additional language: "However, if you find [by a preponderance of the evidence] that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient itself to prove [beyond a reasonable doubt] that [he][she] committed the charged offense[s]. The weight and significance, if any, are for you to decide."

only that a constitutional error has occurred. *Calderon v. Coleman,* 525 U.S. 141, 146, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998). If constitutional error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict before granting habeas relief. *Id.* (citing *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)).

The California Court of Appeal correctly recognized that it must view the instructions "in light of the entire record to determine if there is a 'reasonable likelihood' (*Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)) that the jury understood them as permitting a conviction on a lesser standard." *People v. Smith,* slip op. at 16. It then reviewed the trial record, including the other instructions and counsel's arguments, and concluded that "it is not reasonably likely [the jury] understood the challenged instructions as permitting a conviction on a standard less than beyond a reasonable doubt." *Id.* at 16–17. The court explained:

> On this record we are convinced that the jury understood it could only convict appellant of the present offense based on the reasonable doubt standard. The court gave the standard burden of proof instruction (CALJIC No. 2.90), as well as instructing that the jurors must consider the instructions as a whole and not "single out any particular sentence or ... instruction and ignore the others." (CALJIC No. 1.01.) It instructed that each fact essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. (CALJIC No. 2.01.) In addition to instructing on the specific elements of the charged offense and all lesser included offenses, it instructed that the People had the burden of proving beyond a reasonable doubt (1) each element of murder, and (2) that the act which caused the death was not done in the heat of passion or sudden quarrel. (CALJIC No. 8.50.) It instructed that if the jury had a reasonable doubt as to whether defendant formed the requisite intent for the crimes charged, it must find he did not have that intent. (CALJIC No. 4.21.1.) It instructed that if it had a reasonable doubt between first and second degree murder, or between murder and manslaughter, the jury must return a verdict of the lesser offense. (CALJIC Nos. 8.71, 8.72.) It instructed that the People had the burden of proving beyond a reasonable doubt the allegation that appellant used a deadly weapon on committing the charged offense. (CALJIC No. 17.15.) It instructed that if the jury was not satisfied beyond a reasonable doubt of appellant's guilt of the charged offense, it could convict him of any lesser crime if it was convinced beyond a reasonable doubt of the lesser crime. (CALJIC No. 17.10.)

During their respective closing arguments, the prosecutor observed that the evidence of premeditation was circumstantial, but "if someone has a problem with ... circumstantial evidence, although they believe it proves he is guilty beyond a reasonable doubt but for some reason they say, I can't do it based on circumstantial evidence alone, then you would be disregarding the law." Defense counsel stressed that "before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each factor or circumstance[ ] on which the inference necessarily rests, must be proved beyond a reasonable doubt."

Given the dozen or so times on this record the jury was told that appellant could be convicted of the charged offense only if it found him guilty beyond a reasonable doubt, it is not reasonably likely it understood the challenged in-

structions as permitting a conviction on a standard less than beyond a reasonable doubt. We agree with *Regalado* that "the jurors would have realized that disposition evidence, while probative of defendant's guilt, must be assessed along with all the other evidence to determine whether every element of the offense [charged] was proven beyond a reasonable doubt.... Reasonably intelligent people would—on the instructions given here—merely have put the prior offense[s] into the deliberative mix as a factor to be considered. They would not have stopped after evaluating the prior[s] ..." (*[People v. Regalado* (2000) 78 Cal.App.4th 1056, 1062–63, 93 Cal. Rptr.2d 83.]*)

*People v. Smith,* slip op. at 16–17.

 The California Court of Appeal's decision was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or involved an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). The Supreme Court has made clear that "instructions that might be ambiguous in the abstract can be cured when read in conjunction with other instructions" and the trial record. *Jones v. United States,* 527 U.S. 373, 391, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). Here, the state appellate court reasonably concluded that, in view of the numerous times the jury was instructed and told that petitioner could be convicted of the charged offenses only if it found him guilty beyond a reasonable doubt, a reasonable juror would have merely put the prior offenses into the deliberative mix and would not have understood CALJIC No. 2.50.02 and CALJIC No. 2.50.1 as permit-

ting a conviction on a standard less than beyond a reasonable doubt. *Cf. Mayfield v. Woodford,* 270 F.3d 915, 922–24 (9th Cir.2001) (no constitutional error where court allowed jury to consider "such guilt phase instructions as it found applicable" for penalty phase (raising concerns that they would rely on instructions precluding consideration of mitigating factors) because when viewed as a whole the instructions required the jurors to consider all relevant mitigating evidence for penalty phase; "a reasonable juror would have¹ construed the instructions as requiring him or her to consider all relevant mitigating evidence"). The California Court of Appeal's determination that it is not reasonably likely the jury understood the challenged instructions as permitting a conviction on a standard less than beyond a reasonable doubt was properly based on a "commonsense understanding of the instructions in the light of all that has taken place at the trial," *Boyde,* 494 U.S. at 381, 110 S.Ct. 1190, and cannot be said to be "objectively unreasonable," *Williams v. Taylor,* 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Petitioner is not entitled to federal habeas relief on his instructional error claim. *See id.*

**6.** *Cumulative error*

Petitioner claims that the cumulative effect of the alleged errors deprived him of his due process right to a fair trial.

The Ninth Circuit has held that the cumulative effect of several trial errors may prejudice a defendant so much that his conviction must be overturned, *see Thomas v. Hubbard,* 273 F.3d 1164, 1179–81 (9th Cir.2001);[8] however, it has also

---

**8.** It is unclear whether the Ninth Circuit's holding is based on clearly established Supreme Court precedent. *See Alvarado v. Hill,* 252 F.3d 1066, 1068–69 (9th Cir.2001) (The question under § 2254(d) "is not whether [the conviction] violates due process as that con-

cept might be extrapolated from the decisions of the Supreme Court. Rather, it is whether [the conviction] violates due process under 'clearly established' federal law, as already determined by the Court.")

held that where, as here, there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation, *see Mancuso v. Olivarez,* 292 F.3d 939, 957 (9th Cir.2002); *Fuller v. Roe,* 182 F.3d 699, 704 (9th Cir.1999); *Rupe v. Wood,* 93 F.3d 1434, 1445 (9th Cir.1996). Moreover, this is not one those exceedingly rare cases in which the cumulative effect of the alleged trial errors so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Cf. Thomas,* 273 F.3d at 1179–81 (reversing conviction based on cumulative prejudicial effect of (a) admission of triple hearsay statement providing only evidence that defendant had motive and access to murder weapon; (b) prosecutorial misconduct in disclosing to the jury that defendant had committed prior crime with use of firearm; and (c) truncation of defense cross-examination of police officer, which prevented defense from adducing evidence that someone else may have committed the crime and evidence casting doubt on credibility of main prosecution witness). Petitioner is not entitled to federal habeas relief on his claim of cumulative error/prejudice.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

The clerk shall enter judgment in favor of respondent and close the file. SO ORDERED.